

# In the Missouri Court of Appeals
# Eastern District

<u>DIVISION TWO</u>

| | | |
|---|---|---|
| TIERRA KEMP, INDIVIDUALLY AND AS | ) | ED108982 |
| THE SURVIVING MOTHER OF DECEDENT, | ) | |
| CAMERON KEEPER, | ) | Appeal from the Circuit Court |
| | ) | of St. Louis County |
| Appellant, | ) | |
| | ) | 19SL-CC02897 |
| v. | ) | |
| | ) | Honorable Brian H. May |
| NANCY McREYNOLDS, R.N., MICHELE | ) | |
| COOMBS, R.N., MILLICENT COLEMAN, | ) | Filed:  February 23, 2021 |
| AND NYCOLE UMPHREY, | ) | |
| | ) | |
| Respondents. | ) | |

Tierra Kemp (Kemp) appeals from the trial court's judgment dismissing her petition alleging medical malpractice against Nancy McReynolds, R.N. and Michele Coombs, R.N., and negligence against Millicent Coleman and Nycole Umphrey (collectively, Defendants).  We reverse and remand.

## BACKGROUND

On September 26, 2016, five-year-old Cameron Keeper (Cameron) died as a result of lack of oxygen to her brain.  On July 17, 2019, Cameron's mother, Kemp, filed a petition against Defendants in the St. Louis County Circuit Court alleging claims of negligence and medical malpractice leading to the wrongful death of her daughter.  On January 14, 2020, the trial court

granted Kemp leave to amend her petition. On January 22, 2020, Kemp filed her First Amended Petition, which alleged the following facts.

Cameron was diagnosed with tricuspid atresia, a heart condition which left her dependent upon a tracheostomy. As a result, Cameron relied on a tube inserted into her neck in order to breathe. Cameron's tracheostomy required a daily regimen of regular care, to include: (1) saline administration to her tracheostomy to prevent the site from drying out; (2) routine suction and cleaning of the site to prevent secretions from obstructing her airway; and (3) an immediate replacement of an obstructed trach. This routine care necessitated that Cameron always keep a bag (airway bag) with her containing a suctioning device, a spare trach, and saline. Cameron also utilized a Passy Muir Speaking Valve for limited periods of time to enable her to eat soft foods and engage in minimal verbal communication.[1] However, she could not wear the Passy Muir Valve for extended periods of time, nor did she wear it outside due to the risk her tracheostomy site would rapidly dry out.

Cameron was a bright child and Kemp wanted her to attend school. To achieve this goal, Kemp began an extensive collaboration with the Hazelwood School District and the Special School District of St. Louis County (School Districts) well before Cameron started kindergarten. A diagnostic evaluation deemed Cameron ready for kindergarten because she had high cognitive and pre-academic skills. It was decided she would spend 88% of her time in regular education and the remaining 12% in special education (i.e., small group or individual therapy sessions). Pursuant to 20 U.S.C. § 1414, the diagnostic team developed an Individualized Education Program (IEP) that accommodated Cameron's medical condition with a detailed medical component, developed with Cameron's doctors and parents. It contained orders from her doctors

---

[1] While Cameron's medical condition interfered with her ability to speak, she was able to express her needs through sign language, by mouthing words, and making esophageal sounds.

that were critical to her routine tracheostomy care as well as specific crisis intervention measures. These requirements were provided both verbally and in writing to the School Districts more than a year before Cameron started school.

The medical component was memorialized in Cameron's IEP on a form denominated "Physician Orders for School Based Individualized/Private Duty Nursing Services Plan of Care," to enable her to safely attend school, and required the following: (1) Cameron must always have a one-on-one nurse with her during the school day; (2) Cameron's airway equipment bag must always be with Cameron; (3) Cameron should not be permitted to wear her Passy Muir Valve outside; (4) Cameron should not be permitted to wear her Passy Muir Valve for more than an hour; (5) detailed tracheostomy care instructions including when and how to administer saline, suction Cameron's trach, and change her trach; (6) saline must be administered to Cameron's tracheostomy if it is bleeding or if secretions increase in thickness; (7) Cameron's tracheostomy tube must be suctioned to 7 cm for increased thickness of secretions; (8) Cameron's tracheostomy tube must be suctioned to 7 cm if the trach is bleeding; (9) Cameron's trach must be changed if it is obstructed or a "plug" is suspected; (10) Cameron communicates her need for suctioning or that she is having difficulty breathing by pointing to her tracheostomy; and (11) 911 must be called immediately if any of the following occur: (a) Cameron was struggling to breathe, (b) Cameron had trouble walking and talking due to shortness of breath or her lips or fingernails were blue, (c) Cameron became bluish or very pale, or (d) Cameron passed out.

In addition to her IEP, McReynolds (Cameron's one-on-one nurse) and Coombs (the school nurse) independently received detailed nursing instructions from SSM Health Cardinal Glennon pediatrics. Those instructions included an asthma action plan for Cameron which

3

required administration of nebulized saline and suctioning with a suction catheter if the trach site was bleeding or if the secretions became thicker.

Both School Districts, as well as state and federal statutes, required all school staff to strictly abide by a student's IEP, including any medical requirements and doctor's orders. Therefore, Coleman (Cameron's homeroom teacher) and Umphrey (Cameron's speech therapist) were mandated to review and become familiar with the IEPs for each student under their care or supervision. Medical personnel including McReynolds and Coombs were also required to review and become familiar with all medical components. Furthermore, both School Districts also maintained a departmentally mandated policy (School Policy) that required any staff member, including medical personnel, to immediately call 911 and further required any qualified staff member to perform life-saving procedures, such as CPR, if a student suffered a traumatic or life-threatening injury, including breathing complications.

On August 29, 2016, Cameron began school at Larimore Elementary. The First Amended Petition asserts that on September 22, 2016, violations of her IEP began a series of events that culminated in Cameron's death, when McReynolds failed to remove her Passy Muir Valve before she went out to recess at 1:30 p.m. Both McReynolds and Coleman were charged with supervising Cameron at recess, but McReynolds did not accompany Cameron outside. She also took Cameron's airway bag away from her and placed it in Coleman's locked classroom. Coleman permitted Cameron to attend outdoor recess even though her Passy Muir Valve was still connected to her tracheostomy, her one-on-one nurse was not present, and her airway bag was not with her.

At approximately 1:35 p.m., while McReynolds was inside, Cameron approached Coleman and pointed to her throat – a clear indication she needed suctioning or was having

4

trouble breathing. However, Coleman did not call for McReynolds, send Cameron to the nurse's office, or in any way assist Cameron as she struggled to breathe. McReynolds came outside several minutes later, but failed to bring Cameron's airway bag with her. Coleman said nothing to McReynolds about Cameron having trouble breathing. Instead, they engaged in small talk about McReynolds' day. Cameron approached McReynolds and again pointed to her throat, but McReynolds did nothing.

Cameron's tracheostomy consequently dried out and the site began to bleed, quickly becoming obstructed by thick, bloody secretions, leaving her unable to breathe. Both Coleman and McReynolds watched Cameron collapse, but neither retrieved Cameron's airway bag, performed CPR, or called 911. McReynolds carried Cameron inside the building and sat in a chair outside Umphrey's office and called for her assistance. Upon gaining Umphrey's attention, McReynolds told her that she was unable to get Cameron to the nurse's office. Umphrey noticed Cameron was bleeding from her trach, she was discolored, and her eyes were glazed over. Yet, Umphrey did not perform CPR or call 911. Instead, Umphrey carried Cameron to the school nurse's office.

Upon arrival at the nurse's office at 1:55 p.m., Coombs asked what happened to Cameron. McReynolds said she collapsed on the playground, and that her airway bag was in the classroom. Coombs noted that Cameron "appeared unresponsive," but did not perform CPR or call 911. Instead, Coombs instructed McReynolds and Umphrey to "get ice on Cameron to cool her down," then left to retrieve Cameron's airway bag from Coleman's locked classroom. When Coombs returned with Cameron's airway bag, she asked McReynolds if 911 needed to be called, which would have complied with both the IEP and School Policy in response to this very circumstance. McReynolds declined, stating this is just what happens with Cameron's

5

pulmonary hypertension. Moreover, despite retrieving her airway bag, neither McReynolds nor Coombs provided the necessary care specified both in her IEP and as they were trained by SSM Health Cardinal Glennon pediatrics so Cameron could resume breathing.

When Cameron started foaming at the mouth, Coombs finally paged the school secretary, who called 911 at 2:02 p.m. Thus, 27 minutes elapsed between the time when Cameron began experiencing breathing difficulties and when 911 was called. Cameron spent seven of those minutes in the nurse's office before anyone decided to call 911. Coombs and McReynolds then waited an additional three more minutes – for a total of ten minutes in the nurse's office – before performing CPR.

Emergency medical services (EMS) arrived at 2:11 p.m. Upon observing that her tracheostomy was clogged with blood, EMS immediately replaced her trach – in unwitting compliance with her IEP – and she began breathing again. She was transported to Cardinal Glennon Children's Hospital, where she was diagnosed with hypoxic ischemic encephalopathy and anoxic brain injury due to the obstruction of her tracheostomy. She was kept alive in a coma for four days. On September 26, 2016, it was determined based on neurological criteria that Cameron was irreversibly brain dead. She passed away later that day.

Kemp's First Amended Petition avers four counts seeking relief: (I) wrongful death against McReynolds for medical malpractice; (II) wrongful death against Coombs for medical malpractice; (III) wrongful death against Coleman for negligence; and (IV) wrongful death against Umphrey for negligence. The First Amended Petition alleged all four Defendants breached multiple ministerial duties to abide by Cameron's IEP as well as School Policy. Kemp further asserted the Defendants' conduct was not discretionary and breach of these duties caused Cameron's death.

6

It alleged McReynolds breached the following ministerial duties by failing to:

a. Remove Cameron's Passy Muir Valve before outdoor recess;
b. Stay with Cameron at all times;
c. Ensure Cameron's airway equipment bag was always with Cameron;
d. Call 911 when Cameron began having difficulty breathing;
e. Call 911 when Cameron "passed out" or "collapsed";
f. Call 911 as Cameron's condition progressively worsened as described in detail in the factual allegations pled above;
g. Inspect Cameron's tracheostomy;
h. Retrieve Cameron's airway equipment bag;
i. Administer saline to Cameron's tracheostomy;
j. Suction Cameron's tracheostomy;
k. Change Cameron's trach;
l. Remove Cameron's trach;
m. Initiate CPR; and
n. Familiarize herself with and follow Cameron's doctors' orders, Cameron's departmentally mandated care plan, care guidelines mandated by the [School Districts], and Cameron's IEP.

It alleged Coombs breached the following ministerial duties by failing to:

a. Call 911 when Cameron arrived at the nurse's office;
b. Perform CPR when Cameron arrived at the nurse's office;
c. Instruct others to call 911;
d. Instruct others to perform CPR;
e. Inspect Cameron's tracheostomy;
f. Suction Cameron's tracheostomy;
g. Replace Cameron's trach;
h. Remove Cameron's trach;
i. Call 911 as Cameron's condition worsened;
j. Perform CPR as Cameron's condition worsened; and
k. Familiarize herself with and follow Cameron's doctors' orders, Cameron's departmentally mandated care plan, care guidelines mandated by the [School Districts], and Cameron's IEP.

It alleged Coleman breached the following ministerial duties:

a. Allowing Cameron to go to outdoor recess with her Passy Muir Valve attached to her tracheostomy;
b. Allowing Cameron to go to outdoor recess without her one-on-one nurse;
c. Allowing Cameron to go to outdoor recess without her airway equipment bag;
d. Failing to call 911 when Cameron began having difficulty breathing;
e. Failing to notify Defendant McReynolds when Cameron began having difficulty breathing;

7

f. Failing to send Cameron to the nurse's office when Cameron began having difficulty breathing;

g. Failing to retrieve Cameron's airway equipment bag;

h. Failing to call 911 when Cameron "passed out" or "collapsed";

i. Failing to perform CPR when Cameron "passed out" or "collapsed"; and

j. Failing to familiarize herself with and follow Cameron's doctors' orders, Cameron's departmentally mandated care plan, care guidelines mandated by the [School Districts], and Cameron's IEP.

It alleged Umphrey breached the following ministerial duties by failing to:

a. Call 911 when she observed that Cameron was bleeding from her trach, she was discolored, and her eyes were glazed over;

b. Call 911 when Cameron "appeared unresponsive";

c. Call 911 as Cameron's condition worsened; and

d. Familiarize herself with and follow Cameron's doctors' orders, Cameron's departmentally mandated care plan, care guidelines mandated by the [School Districts], and Cameron's IEP.

On February 3, 2020, Coleman and Coombs filed motions to dismiss counts II and III of the First Amended Petition. On February 7, 2020, McReynolds and Umphrey filed motions to dismiss counts I and IV of the First Amended Petition. The four motions to dismiss argued the First Amended Petition failed to state a claim because: (1) official immunity protected Defendants from liability arising from their acts in performance of their official duties as public employees; (2) the Paul D. Coverdell Teacher Protection Act of 2001 (Coverdell Act), 20 U.S.C. §§ 7941 – 7948, protected Coleman from liability; and (3) it failed to comply with Section 538.225 RSMo.[2] On May 5, 2020, the trial court granted all four motions to dismiss without explanation.

This appeal follows.

**STANDARD OF REVIEW**

Appellate courts review a trial court's grant of a motion to dismiss de novo. *Goldsby v. Lombardi*, 559 S.W.3d 878, 881 (Mo. banc 2018) (quoting *Ward v. W. Cty. Motor Co., Inc.*, 403

---

[2] All statutory references are to RSMo (2016), unless otherwise indicated.

S.W.3d 82, 84 (Mo. banc 2013)). In determining the appropriateness of the trial court's dismissal, the appellate court reviews the grounds raised in the defendant's motion to dismiss. *Id.* (quoting *In re Estate of Austin*, 389 S.W.3d 168, 171 (Mo. banc 2013)). The trial court's dismissal must be affirmed if any ground supports the motion. *Id.* (quoting *Avery Contr., LLC v. Niehaus*, 492 S.W.3d 159, 162 (Mo. banc 2016)). Conversely, the trial court's dismissal must be reversed if the motion to dismiss cannot be sustained on any ground alleged in the motion. *Id.* (quoting *Lang v. Goldsworthy*, 470 S.W.3d 748, 750 (Mo. banc 2015)).

A motion to dismiss for failure to state a claim is solely a test of the adequacy of the plaintiff's petition. *City of Lake St. Louis v. City of O'Fallon*, 324 S.W.3d 756, 759 (Mo. banc 2010). A court reviews the petition "in an almost academic manner, to determine if the facts alleged meet the elements of a recognized cause of action, or of a cause that might be adopted in that case." *Id.* (quoting *Nazeri v. Mo. Valley Coll.*, 860 S.W.2d 303, 306 (Mo. banc 1993)). A court must accept the petition's properly pleaded facts as true, giving the pleadings their broadest intent, and construe all allegations favorably to the pleader. *See R.M.A. by Appleberry v. Blue Springs R-IV Sch. Dist.*, 568 S.W.3d 420, 424 (Mo. banc 2019). The court may not weigh the factual allegations to determine whether they are credible or persuasive. *Id.*

A plaintiff must properly plead a public official defendant's breach of a ministerial duty in order to properly state a claim. *See State ex rel. Twiehaus v. Adolf*, 706 S.W.2d 443, 445 (Mo. banc 1986) (holding that plaintiffs failed to state a claim where their "petition [did] not aver the existence of either a statutory or departmentally-mandated duty, nor [did] the petition allege the breach of such a duty."); *Nguyen v. Grain Valley R-5 Sch. Dist.*, 353 S.W.3d 725, 730 (Mo. App. W.D. 2011) ("[A]bsent allegations that a state official violated either a statutory or

9

departmentally-mandated duty, a petition's pleadings are insufficient to state a claim which is not barred by the doctrine of official immunity as a matter of law.") (internal quotations omitted).

However, a defendant asserting the affirmative defense of official immunity bears the burden of proving it applies. *State ex rel. Alsup v. Kanatzar*, 588 S.W.3d 187, 193 (Mo. banc 2019); *Nguyen*, 353 S.W.3d at 730 ("As the party asserting the affirmative defense of official immunity, the individual defendants bore the burden of pleading and proving they are entitled to that defense."). Consequently, when "an affirmative defense is asserted in a motion to dismiss, a trial court may dismiss the petition only if the petition clearly establishes 'on its face and without exception' that the defense applies and the claim is barred." *Nguyen*, 353 S.W.3d at 729; *see also City of Lake St. Louis*, 324 S.W.3d at 764. Thus, it is error to dismiss a properly pled petition by reaching the merits of an affirmative defense, because the role of the court is merely to determine whether the petition states a claim upon which relief can be granted, not whether the petition's claims will ultimately prove meritorious.

**DISCUSSION**

Kemp raises four points challenging the trial court's dismissal of her First Amended Petition, arguing: (1) official immunity does not protect public officials from their negligent performance of ministerial duties; (2) official immunity is not available to public officials who commit medical malpractice when performing basic healthcare tasks; (3) the Coverdell Act does not immunize Coleman from liability for the duties she breached here because they were not efforts to control, discipline, expel, or suspend Cameron; and (4) Kemp properly complied with Section 538.225.[3]

---

[3] McReynolds and Coombs both concede that Kemp properly filed affidavits in compliance with Section 538.225. Accordingly, Point IV is granted.

10

**Point I**

In Point I, Kemp argues the trial court erred in granting all Defendants' motions to dismiss based on official immunity because the IEP and School Policy were ministerial in nature and official immunity does not apply to breaches of ministerial duties. Defendants respond that their actions were discretionary and, therefore, protected by official immunity. The issue is whether the First Amended Petition clearly establishes on its face and without exception that Defendants' acts were discretionary rather than ministerial.

*Analysis*

The doctrine of official immunity protects a public official from liability if that official acts: (1) within the course of his official duties, and (2) without malice. *Alsup*, 588 S.W.3d at 190. "[S]ociety's compelling interest in vigorous and effective administration of public affairs requires that the law protect those individuals who, in the face of imperfect information and limited resources, must daily exercise their best judgment in conducting the public's business." *Id.* at 191 (quoting *Kanawaga v. State ex rel. Freeman*, 685 S.W.2d 831, 836 (Mo. banc 1985)). Public officials are protected from liability for their performance of these sorts of discretionary acts to enable them to make judgments affecting the public safety and welfare without the fear of personal liability. *Id.* at 190.

A task is considered discretionary when it requires the individual's own judgment regarding the propriety of the task to be performed and requires the public official to carry it out "fairly," "competently," "safely," or "reasonably" in a given situation. *Id.* at 193. Discretion is required in a situation "teeming with the necessity for quick judgment calls," such as when police officers encounter an individual who brandishes a gun, or when a teacher must physically restrain a student struggling to get away from school. *Id.* at 194.

11

However, a narrow exception to official immunity exists such that when a public officer fails to perform a ministerial duty required by law, and may be personally liable for the ensuing damages. *Id.* at 191. Generally, a ministerial act has long been defined as merely "clerical." *Id.* (citing *McFaul v. Haley*, 65 S.W. 995, 998 (Mo. 1901)). "A ministerial or clerical duty is one in which a certain act is to be performed 'upon a given state of facts in a prescribed manner in obedience to the mandate of legal authority, and without regard to [the public official's] judgment or opinion concerning the propriety or impropriety of the act to be performed.'" *Id.* (quoting *State ex rel. Forgrave v. Hill*, 198 S.W. 844, 846 (Mo. banc 1917)). The central question is whether there is any room whatsoever for variation in when and how a particular task can be done. *Id.*

The determination of whether an act is discretionary or ministerial is made on a case-by-case basis, considering: (1) the nature of the public employee's duties; (2) the extent to which the act involves policymaking or exercise of professional judgment; and (3) the consequences of not applying official immunity. *Southers v. City of Farmington*, 263 S.W.3d 603, 610 (Mo. banc 2008). In cases where the public official's duties are found to be discretionary, the issue is typically litigated upon a motion for summary judgment. *See e.g., Alsup*, 588 S.W.3d at 193 (writ of prohibition made permanent upon trial court's failure to enter summary judgment in favor of an in-school suspension supervisor who was entitled to official immunity because he exercised his discretion in choosing between two different school policies to subdue an unruly student which caused his injury); *Elias v. Davis*, 535 S.W.3d 737, 743 (Mo. App. W.D. 2017) (summary judgment properly granted to football coach on his defense of official immunity because "the record did not demonstrate a rule, regulation, policy, or direct order of a superior

12

that was violated" in supervising football practice). However, this case was decided upon the Defendants' motions to dismiss the First Amended Petition.

Three cases are particularly instructive in analyzing whether a plaintiff's petition is sufficiently pled to survive a motion to dismiss based on official immunity: (1) *Nguyen*, 353 S.W.3d 725; (2) *Stephens v. Dunn*, 453 S.W.3d 241 (Mo. App. S.D. 2014); and (3) *McCoy v. Martinez*, 480 S.W.3d 420 (Mo. App. E.D. 2016).

In *Nguyen*,[4] the Western District held that a petition properly stated a claim and was not barred by official immunity where the petition specifically alleged that two teachers and a health aide caused a student's death by failing to comply with the applicable rules, policies, and guidelines established by statute, the Missouri Department of Education, the Missouri Department of Health and Senior Services, the Missouri State Board of Nursing, and the Grain Valley R-5 School District. *Id.* at 731-33. The appellate court held the petition properly pleaded the existence and breach of ministerial duties against the teachers and health aide. *Id.* However, the court also held the petition's allegations against four supervisory employees failed to properly state claims against them because unlike the two teachers and health aide, the allegations against the supervisory employees did not claim any duty they directly owed to the student. *Id.* at 733 n.7. Thus, the claims against those four supervisory employees were properly dismissed because the pleadings did not show their duties were ministerial. *Id.*

In *Stephens*, the Southern District held that a petition failed to state a claim on the basis of official immunity by failing to plead specific facts showing the public officials had a statutory

---

[4] We note that in *Nguyen*, upon consideration of the defendants' motions to dismiss, the trial court expressly stated that evidence was required for it to rule on the issue of official immunity. 353 S.W.3d at 729. After the trial court heard and considered the evidence, it indicated it was treating the public officials' motions to dismiss as motions for summary judgment. *Id.* Thus, the Western District reviewed the trial court's decision as a motion for summary judgment. *Id.*

13

or departmentally mandated duty and failed to perform such a duty, or that the public officials performed a discretionary duty with bad faith or malice. 453 S.W.3d at 253. The court held that on a motion to dismiss, the plaintiff bore the burden of alleging facts establishing that an exception to the affirmative defense of official immunity applied. *Id.* at 251. The court explained that *Nguyen* "did not eliminate a plaintiff's requirement to allege a duty *from some source*, including statutorily or departmentally-mandated, departmental rules, or orders from a superior, and breach of that duty, in order to state a claim which is not barred by official immunity." *Id.* at 251 n.13 (emphasis in original).

In *McCoy*, this Court held that a petition failed to state a claim on the basis of official immunity where the petition did not allege that a physical education teacher failed to comply with school policies or regulations concerning the safety of the students under his control. 480 S.W.3d at 426. In fact, it is noteworthy that the petition actually alleged the PE teacher acted "in accordance with school policy and curriculum" when his actions caused injury to a student. *Id.* This Court held that the petition's failure to allege a *breach* of a ministerial duty (i.e., a failure to follow the department policy, rules, or guidelines), not merely performance of ministerial conduct causing an injury, required the plaintiff's petition to be dismissed for failure to state a claim. *Id.*

Here, the First Amended Petition alleged each Defendant was required by School Policy to follow the general guidelines mandated for any student in Cameron's condition, as well as federal and state law to comply with all directives set forth in her IEP. The petition clearly and specifically alleged: all school staff, including Defendants, were required by School Policy to call 911 if any student was having difficulty breathing. Moreover, the medical component to Cameron's IEP specifically required 911 to be called immediately if Cameron was struggling to

14

breathe, had trouble walking, had shortness of breath, or her lips or fingernails were blue.  It further alleged the requirement to abide by a student's IEP was a ministerial duty because it required teachers and nurses to carry out the specific orders upon a given set of facts, in a prescribed manner, in obedience to the mandate of medical authority, without regard to the teacher or nurse's own judgment or opinion concerning the propriety of the act to be performed.

The allegations in the First Amended Petition are similar to those in *Nguyen* because they plead the existence and breach of specific ministerial duties owed to Cameron which caused her death.  These allegations do not suffer from the pleading deficiencies in *Stephens*, where the petition failed to allege that the duties derived from statutory or departmentally mandated policy. Nor do these allegations suffer from the pleading defect in *McCoy*, where the petition not only failed to allege an actual breach of the ministerial duties, but actually averred that the defendant had complied with school policy.

Taken as true for purposes of the motion to dismiss, the First Amended Petition's specific allegations, *inter alia*, that Defendants were required by School Policy as well as Cameron's IEP to call 911 upon observing Cameron having difficulties breathing and that Defendants breached this duty by failing to immediately call 911, are sufficient to survive a motion to dismiss.  The face of the petition does not clearly establish that Defendants had the discretion to decide whether to call 911 upon observing Cameron having difficulties breathing.  Thus, the First Amended Petition properly states a claim that Defendants breached a ministerial duty and therefore fall within the ministerial act exception to official immunity.  The trial court erred in granting Defendants' motions to dismiss based on official immunity.  Point I is granted.

15

**Point II**

In Point II, Kemp argues the trial court erred in granting McReynolds and Coombs' motions to dismiss based on official immunity because official immunity is not available to defendants who commit medical malpractice when performing basic healthcare tasks. Kemp asserts McReynolds and Coombs failed to perform basic healthcare tasks such as suctioning and changing Cameron's trach as required per her IEP. McReynolds and Coombs argue the face of the petition makes clear they are entitled to official immunity because they were responding to a true emergency. The question presented is whether the face of the petition clearly establishes that McReynolds and Coombs treated Cameron in a true emergency situation.

*Analysis*

Publicly employed medical professionals are not protected by official immunity unless they are acting in a "true emergency situation." *Thomas v. Brandt*, 325 S.W.3d 481, 484 (Mo. App. E.D. 2010). A true emergency situation is a strict requirement, involving rapidly evolving circumstances where medical personnel have limited information. *Id.* The determination whether a situation is a "true emergency" is made on a case-by-case basis, evaluating the totality of the circumstances. *Id.*

In *Thomas*, this Court found there was no true emergency where an emergency medical technician and paramedic arrived at a 911 call, spoke with the plaintiff who was in respiratory distress about his symptoms, and performed multiple tests to obtain vital signs. *Id.* Thus, the EMT and paramedic had sufficient time and information available to them, which was more like a doctor treating a patient in a hospital than an emergency responder arriving to find a patient in critical and devolving condition, such that they were not entitled to the protections of official immunity. *Id.* at 485.

16

Here, the First Amended Petition claimed that McReynolds and Coombs were more akin to treating a patient in a hospital because they had sufficient information available to them based upon Cameron's IEP. EMS immediately replaced Cameron's trach in compliance with the most basic terms of her IEP. Unlike McReynolds and Coombs, these EMS responders truly had limited information and made quick decisions in the face of rapidly evolving circumstances, and are the type of medical personnel meant to benefit from the protections of official immunity.

Thus, the face of the First Amended Petition does not clearly establish that McReynolds and Coombs treated Cameron in a true emergency situation. The trial court erred in granting McReynolds and Coombs' motions to dismiss based on official immunity. Point II is granted.

**Point III**

In Point III, Kemp argues the trial court erred in granting Coleman's motion to dismiss based on the Coverdell Act because Coleman was not attempting to control, discipline, expel, or suspend a student or maintain order or control in the classroom or school when Coleman allowed Cameron to go to recess with the Passy Muir Valve attached to her tracheostomy, failed to ascertain Cameron's one-on-one nurse was with her at all times, and failed to call 911 when Cameron had difficulties breathing.[5] Coleman argues the Coverdell Act clearly applies to her actions because she was attempting to maintain order or control over the students and therefore the Coverdell Act protects her from liability. The question presented is whether the face of the petition clearly establishes that Coleman is protected by the Coverdell Act.

---

[5] Kemp also makes this argument as against Umphrey. However, Umphrey did not argue that she was protected by the Coverdell Act in her motion to dismiss. Where motions to dismiss are granted without explanation, we consider only the grounds raised in the motion to dismiss. *Goldsby*, 559 S.W.3d at 881. In addition, Umphrey concedes this point on appeal. Therefore, we limit our consideration of the Coverdell Act to whether it applies to Coleman.

17

*Analysis*

Similar to official immunity, the Coverdell Act is an affirmative defense. *See M.C.-B. ex rel. T.B. v. Hazelwood Sch. Dist.*, 417 S.W.3d 261, 265 (Mo. App. E.D. 2013). Thus, the affirmative defense of the Coverdell Act must be clearly established on the face of the petition to support a motion to dismiss. *See Nguyen*, 353 S.W.3d at 729. In order to claim the protection of the Coverdell Act, teachers must establish, *inter alia*, the following elements:

> (1) the teacher was acting within the scope of the teacher's employment or responsibilities to a school or governmental entity;
> (2) the actions of the teacher were carried out in conformity with Federal, State, and local laws (including rules and regulations) in furtherance of efforts to control, discipline, expel, or suspend a student or maintain order or control in the classroom or school;
> (3) if appropriate or required, the teacher was properly licensed, certified, or authorized by the appropriate authorities for the activities or practice involved in the State in which the harm occurred, where the activities were or practice was undertaken within the scope of the teacher's responsibilities;
> (4) the harm was not caused by willful or criminal misconduct, gross negligence, reckless misconduct, or a conscious, flagrant indifference to the rights or safety of the individual harmed by the teacher; and
> . . .

20 U.S.C. § 7946.

The First Amended Petition alleges Coleman breached both School Policy as well as federal and state statute which required her compliance with Cameron's IEP by failing to call 911 when she observed Cameron having breathing difficulties and eventually collapse. The petition does not allege that Coleman's failure to call 911 was "in furtherance of efforts to control, discipline, expel, or suspend a student or maintain order or control in the classroom or school." Coleman argues she could not have maintained control of her students if she called 911. However, this is not clearly established by the face of the petition, which says nothing about whether Coleman's failure to call 911 was a result of her decision to maintain control of her students at recess. Accordingly, the face of the petition does not clearly establish the second

18

element required for the protection of the Coverdell Act.  The trial court erred in granting Coleman's motion to dismiss based on the Coverdell Act.  Point III is granted.

## CONCLUSION

In conclusion, the First Amended Petition properly pleads the recognized exception to the doctrine of official immunity and the affirmative defenses asserted by Defendants are not clearly established on the face of the pleadings such that Plaintiff's claims are barred.  Therefore, the trial court erred in dismissing the First Amended Petition.  The judgment of the trial court is reversed and remanded for further proceedings consistent with this opinion.

_____
Lisa P. Page, Judge

Robin Ransom, P.J. and
Sherri B. Sullivan, J., concur.

19